150 T.C. No. 3

UNITED STATES TAX COURT

SIH PARTNERS LLLP, EXPLORER PARTNER CORPORATION, TAX
MATTERS PARTNER, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 3427-15.                                Filed January 18, 2018.

S was the U.S. shareholder of two CFCs that guaranteed loans
made to a U.S. person. R determined that S must include in its gross
income for the tax years in issue the CFCs' applicable earnings
pursuant to I.R.C. secs. 951(a)(1)(B) and 956(d). R's determination
relied on regulations promulgated under I.R.C. sec. 956 (regulations).
R also determined that the amounts included in S's gross income
should be taxed as ordinary income.

P contends that the regulations are invalid and that in the
absence of valid regulations R's determination cannot be sustained.
If we sustain R's determination of the amounts included under I.R.C.
secs. 951(a)(1)(B) and 956(d), P contends that the amounts should be
taxed as qualified dividend income under I.R.C. sec. 1(h)(11).

Held: The regulations are valid, and R correctly determined
that S must include in gross income the CFCs' applicable earnings for
the tax years in issue.

*Held*, *further*, the amounts included in P's gross income pursuant to I.R.C. secs. 951(a)(1)(B) and 956(d) are not qualified dividend income under I.R.C. sec. 1(h)(11).

Mark D. Lanpher, Robert A. Rudnick, and Kristen M. Garry, for petitioner.

Jeffrey B. Fienberg, Richard A. Rappazzo, and Julie Ann P. Gasper, for respondent.

OPINION

COHEN, Judge: On November 10, 2014, respondent issued two notices of final partnership administrative adjustment (FPAAs) to Explorer Partner Corp. (Explorer Corp.) as tax matters partner for SIH Partners LLLP (SIHP) for tax years 2007 and 2008. In the FPAAs respondent determined that SIHP has income inclusions under sections 951(a)(1)(B) and 956 of $375,392,988 and $1,697,247 for 2007 and 2008, respectively. In the FPAAs respondent also determined that the income inclusions for SIHP are not qualified dividend income eligible for the preferential 15% tax rate under section 1(h)(11).

The issues for consideration are: (1) whether SIHP has income inclusions under sections 951(a)(1)(B) and 956 in amounts equal to the respective applicable

earnings of two of its controlled foreign corporations because these entities guaranteed loans that Merrill Lynch made to Susquehanna International Group, LLP (SIG), and (2) if SIHP has income inclusions under sections 951(a)(1)(B) and 956, whether the income inclusions are qualified dividend income under section 1(h)(11). These issues are before the Court on the parties' cross-motions for summary judgment pursuant to Rule 121. Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the tax years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Summary judgment is intended to expedite litigation and avoid unnecessary and expensive trials. Fla. Peach Corp. v. Commissioner, 90 T.C. 678, 681 (1988). Summary judgment may be granted with respect to all or any part of the legal issues in controversy "if the pleadings, answers to interrogatories, depositions, admissions, and any other acceptable materials, together with the affidavits or declarations, if any, show that there is no genuine dispute as to any material fact and that a decision may be rendered as a matter of law." Rule 121(b). Respondent contends that no genuine issue of material fact exists with respect to either issue. Petitioner challenges the validity of the regulations on which respondent relied in making the determinations in the FPAAs, and it contends that if we conclude that

the regulations are invalid then summary judgment in its favor is appropriate. If those regulations are not invalid, then petitioner contends that issues of material fact remain in dispute as to whether respondent properly applied the regulations to the facts and circumstances of this case. We conclude that all facts material to the Court's disposition of the cross-motions for summary judgment can be drawn from the parties' stipulations and are not reasonably in dispute.

## Background

We state the stipulated facts in greater detail than may be necessary so that the record is complete.

### Formation of SIHP

Explorer Corp., a Delaware corporation, is an S corporation for Federal income tax purposes. During the tax years in issue Explorer Corp. had the following shareholders: Eric Brooks (Brooks), Joel Greenberg (Greenberg), Arthur Dantchik (Dantchik), and Jeffrey Yass (Yass).

From the beginning of 2007 through March 2007, Brooks, Greenberg, Dantchik, Yass, and a fifth individual, Andrew Frost (Frost), were the sole shareholders of Susquehanna International Holdings, Inc. (SIH Inc.). SIH Inc., a Delaware corporation incorporated in 1999, was an S corporation for Federal income tax purposes. In March 2007 SIH Inc. redeemed Frost's shares. On or

after March 31, 2007, Brooks, Greenberg, Dantchik, and Yass were the remaining shareholders of SIH Inc.

On or after April 2, 2007, Brooks, Greenberg, Dantchik, and Yass transferred the stock of SIH Inc. to Explorer Corp. Following the transfer, SIH Inc. converted to a limited liability company, which was disregarded as an entity separate from its owner for Federal income tax purposes, and changed its name to Susquehanna International Holdings, LLC (SIH LLC). The steps of these transactions were treated together as a reorganization under section 368(a)(1)(F).

On April 2, 2007, SIHP was formed as a Delaware partnership. On or about April 3, 2007, Explorer Corp. transferred SIH LLC to SIHP in exchange for a 1% ownership interest in SIHP. Explorer Corp. is the tax matters partner for SIHP.

From on or about April 3, 2007, through the end of tax years 2007 and 2008 five S corporations owned the remaining 99% of SIHP in varying ownership percentages. Brooks, Greenberg, Dantchik, Yass, and a fifth individual, Mark Dooley (Dooley), each owned 100% of one of the S corporations.

SIG US and International Affiliates

During the tax years in issue Brooks, Greenberg, Dantchik, Yass, Dooley, and Frost owned collectively and through certain entities 100% of the interest in SIG. SIG and its U.S. affiliates (together, SIG US) constitute an investment firm

that trades, directly and through various affiliates, most listed financial products and asset classes. SIG US trades these products primarily through broker-dealers registered with the U.S. Securities and Exchange Commission. During the tax years in issue SIHP owned indirectly certain of SIG's international affiliates.

SIHL and SEHL

From on or about January 1, 2007, to on or about April 2, 2007, SIH Inc. owned 100% of the stock of Susquehanna Ireland Holdings Limited (SIHL), a corporation organized under the laws of Ireland. From on or about April 3, 2007, to on or about December 3, 2007, SIH LLC owned 100% of SIHL's stock. Through SIH LLC (an entity disregarded for Federal income tax purposes) SIHP was treated as owning 100% of SIHL's stock.

On December 4, 2007, SIHL was acquired by Susquehanna Europe Holdings Limited (SEHL), a corporation newly organized under the laws of Ireland and whose tax residency was in Luxembourg. In connection with the acquisition, SIHL elected to be classified as a disregarded entity for Federal income tax purposes. This acquisition and election together constituted a reorganization under section 368(a)(1)(F). From December 4, 2007, through December 31, 2008, SIHP owned SEHL through SIH LLC and other entities disregarded for Federal income tax purposes.

From the beginning of tax year 2007 until its reorganization SIHL was a controlled foreign corporation (CFC) within the meaning of section 957(a). SIHP was a "United States shareholder" under section 951(b) with respect to SIHL that owned within the meaning of section 958(a) 100% of SIHL's stock. From its organization and throughout tax years 2007 and 2008, SEHL was also a CFC. SIHP was a U.S. shareholder of SEHL that owned 100% of SEHL's stock. SEHL is the successor to SIHL (together, SIHL/SEHL).

STS

From on or about January 1, 2007, to on or about April 2, 2007, SIH Inc. owned 100% of the stock of Susquehanna Trading Services, Inc. (STS), a company organized under the laws of the Cayman Islands that was treated as a corporation for Federal income tax purposes. From on or about April 3, 2007, through December 31, 2008, SIH LLC owned the stock of STS. Through SIH LLC, SIHP was treated as owning STS's stock.

During tax years 2007 and 2008 STS was a CFC. SIHP was a U.S. shareholder with respect to STS that owned within the meaning of section 958(a) 100% of STS' stock.

Loan Received by SIG

Before 2007, SIG and its affiliates had a longstanding relationship with the brokerage firm Merrill Lynch. Merrill Lynch acted as prime broker to SIG and its affiliates. As prime broker, Merrill Lynch cleared securities and commodities transactions in which SIG and its affiliates engaged, and it held as custodian for SIG and its affiliates the resulting security and commodity positions from such trading. Merrill Lynch provided margin loans to SIG and its affiliates, and it held a security interest in the assets that SIG and its affiliates maintained in accounts at Merrill Lynch.

The Notes

On October 2, 2007, SIG issued three notes payable to certain Merrill Lynch affiliates (SIG notes): (1) the Seventh Amended and Restated Promissory Note in the amount of $1.4 billion between SIG as borrower and Merrill Lynch International (MLI) as lender; (2) the Amended and Restated Promissory Note in the amount of $75 million between SIG and Merrill Lynch Professional Clearing Corp. (ML Pro, and together with MLI, Merrill Lynch); and (3) the Second Amended and Restated Promissory Note in the amount of $10 million between SIG and ML Pro. The SIG notes evidenced $1.485 billion in aggregate borrowing

separate and apart from the margin loans that Merrill Lynch provided in the ordinary course of its role as SIG's prime broker.

The Guaranties

On October 2, 2007, SIG also executed jointly with its affiliates the Amended and Restated Guarantee and Security Agreement (ARGSA). Pursuant to the ARGSA, 39 entities guaranteed the SIG notes. SIHL and STS were two of the guarantors of the SIG notes under the ARGSA. The remaining 37 guarantors were either domestic entities or entities disregarded for Federal income tax purposes. On December 8, 2007, SEHL executed a Joinder Agreement, in which SEHL acknowledged that it was a party to and guarantor under the ARGSA. Certain SIG affiliates under the ARGSA also pledged their assets as collateral for the SIG notes. SIHL/SEHL and STS were neither pledgors nor pledged entities under the ARGSA.

Under the ARGSA each guarantor assumed joint and several liability for the full payment of the SIG notes. The ARGSA included a "pro rata provision" under which if any guarantor made any payment or suffered any loss pursuant to its guaranty, then it became entitled to contribution payments from the remaining guarantors. The provision stated that each nonpaying guarantor would be required to contribute to the paying guarantor an amount equal to its "pro rata share" of any

such payment. The ARGSA defined a given guarantor's "pro rata share" of any payment as the ratio of funds that the guarantor had received from affiliates since the date of the ARGSA to the aggregate amount of all funds that all guarantors had received from affiliates during the same period.

The SIG notes remained outstanding through December 31, 2008. As of that date, $1.285 billion in principal remained outstanding on the SIG notes. SIG fully repaid the SIG notes as of December 22, 2011. No guarantor was ever called upon to pay any amount due under the SIG notes pursuant to its obligations under the ARGSA.

CFCs' Earnings & Profits and Distributions

SIHL/SEHL

As of January 1, 2007, SIHL had accumulated earnings and profits of $360,694,422. Between January and March of 2007, SIHL distributed $359,600,000 to SIH Inc., before SIH Inc.'s reorganization under section 368(a)(1)(F). For tax year 2007 SIHL/SEHL generated together current earnings and profits of $293,565,145.

As of January 1, 2008, SEHL had accumulated earnings and profits of $294,659,567. For tax year 2008 SEHL had a deficit in current earnings and profits of $148,430,260. SEHL did not make any distributions in 2008.

STS

As of January 1, 2007, STS had accumulated earnings and profits of $84,164,022. As of that date, $3,625,469 was previously taxed earnings and profits, as described in section 959(c)(2). For tax year 2007 STS generated current earnings and profits of $1,426,209.

As of January 1, 2008, STS had accumulated earnings and profits of $85,590,231. For 2008 STS generated $1,697,247 of current earnings and profits. STS did not make any distributions in either 2007 or 2008.

Income Inclusions Determined by Respondent

Respondent determined in the FPAAs that SIHP had income inclusions pursuant to section 951(a)(1) for the tax years in issue as a result of SIHL/SEHL's and STS' guaranties of the SIG notes. The FPAAs stated that the inclusions were from the "investment of earnings in U.S. property" by the CFCs.

Discussion

I.    The Amount Included Under Sections 951(a)(1)(B) and 956

In the ordinary case, foreign source income earned by a CFC is not subject to U.S. taxation until it is repatriated in the form of a dividend or other distribution to the CFC's U.S. shareholders. Secs. 881 and 882; Dave Fischbein Mfg. Co. v. Commissioner, 59 T.C. 338, 353 (1972); see also S. Rept. No. 87-1881, at 78

(1962), 1962-3 C.B. 703, 784.  However, under section 951(a), a U.S. shareholder must include in gross income for the current taxable year its pro rata share of certain items attributable to the CFC, regardless of whether any distribution was actually made.  This includes "the amount determined under section 956".  See sec. 951(a)(1)(A) and (B).

The amount determined under section 956 with respect to a U.S. shareholder for the taxable year is the lesser of:  (1) the shareholder's pro rata share of the average amount of "United States property" held by the CFC during the taxable year (less the amount of any previously taxed earnings and profits described in section 959(c)(1)(A) with respect to that shareholder) or (2) the shareholder's pro rata share of the CFC's "applicable earnings" as described in section 956(b)(1). Sec. 956(a).  Generally the amount taken into account with respect to any property that is United States property under section 956(a) is its adjusted basis, reduced by any liability to which the property is subject.  Id. (flush language).

Section 956(c) defines United States property that will cause an inclusion for a U.S. shareholder if held directly or indirectly by the CFC during the taxable year.  United States property includes:  (A) tangible property located in the United States; (B) the stock of a domestic corporation; (C) the obligation of a United States person; and (D) certain intangible property acquired or developed by the

CFC for use in the United States. Sec. 956(c)(1). Section 956(c)(2) provides a list of exceptions for items that would otherwise qualify as United States property under section 956(c)(1). Property specifically excepted from the definition of United States property includes, e.g., obligations of the United States and property located in the United States which is purchased in the United States for export to, or use in, foreign countries. See sec. 956(c)(2)(A) and (B).

Section 956(d) provides that a CFC "shall, under regulations prescribed by the Secretary, be considered as holding an obligation of a United States person if * * * [the CFC] is a pledgor or guarantor of such obligation." Regulations prescribe in general (1) when a CFC's pledge or guaranty will be considered the same as holding the underlying obligation and (2) the amount of any obligation considered to be held, for purposes of determining the amount of United States property held by the CFC as a result of its pledge or guaranty. See, e.g., secs. 1.956-1(e)(2), 1.956-2(c)(1), Income Tax Regs.

As in effect for the tax years in issue, section 1.956-2(c)(1), Income Tax Regs., provides that "any obligation * * * of a United States person * * * with respect to which a controlled foreign corporation is a pledgor or guarantor shall be considered for purposes of section 956(a) * * * to be United States property held by such controlled foreign corporation." (Emphasis added.) Under regulations

that address "indirect" pledges and guaranties, a CFC whose assets serve (even though indirectly) as security for the performance of an obligation of a United States person will be considered a pledgor or guarantor of that obligation. Sec. 1.956-2(c)(2), Income Tax Regs. A CFC is not treated as holding United States property under the general rule of section 1.956-2(c)(1), Income Tax Regs., if it makes a pledge or guaranty of an obligation of a United States person and that person "is a mere conduit in a financing arrangement." Sec. 1.956-2(c)(4), Income Tax Regs.

Section 1.956-1(e), Income Tax Regs., provides rules for determining the amount attributable to United States property taken into account under section 956, and section 1.956-1(e)(2), Income Tax Regs., provides the rule for pledges and guaranties. As in effect for the tax years in issue, section 1.956-1(e)(2), Income Tax Regs., provides that "the amount taken into account with respect to any pledge or guarantee * * * shall be the unpaid principal amount on the applicable determination date of the obligation with respect to which the controlled foreign corporation is a pledgor or guarantor." (Emphasis added.)

Respondent contends that the applicable regulations and the undisputed facts of this case support the determined income inclusions without the need for additional fact finding. It is undisputed that the CFCs guaranteed obligations (the

SIG Notes) of a United States person (SIG) and that SIHP was during the tax years in issue a U.S. shareholder that owned or was considered as owning 100% of both CFCs' stock. Respondent contends that the general rule of section 1.956-2(c)(1), Income Tax Regs., applies to the CFCs' guaranties and the CFCs are accordingly considered to have held the underlying obligations under section 956(d). Respondent contends that the amount of the United States property considered held by each CFC equaled the unpaid principal amounts of the SIG notes as of the close of each quarter for which the CFCs remained guarantors. See sec. 1.956-1(e)(2), Income Tax Regs. The SIG notes remained outstanding and the CFCs remained guarantors under the ARGSA from October 7, 2007, at least through December 31, 2008.

Respondent contends that the amounts determined under section 956 that should be included in SIHP's gross income under section 951(a)(1)(B) are limited in this case to the CFCs' respective applicable earnings for the tax years in issue. The average unpaid principal amounts of the SIG notes during the tax years in issue exceeded the CFCs' applicable earnings for those years as calculated under section 956(b)(1). The parties have stipulated the CFCs' applicable earnings for the tax years in issue.

Petitioner contends, and respondent does not dispute, that section 956(d) is not self-executing and that the applicability of section 951(a)(1)(B) and the amount of the income inclusions at issue can be determined only by reference to regulations promulgated by the Department of the Treasury (Treasury), specifically sections 1.956-2(c)(1) and 1.956-1(e)(2), Income Tax Regs. Petitioner's principal argument, on which its motion for summary judgment rests, is that these regulations are invalid. Petitioner contends that in the absence of valid regulations the income inclusions determined by respondent cannot be sustained.

II.    Validity of Regulations

Petitioner contends that the subject regulations are arbitrary and capricious under principles of administrative law. It contends that in the process of promulgating the regulations Treasury failed to engage in reasoned decisionmaking or to provide a reasoned explanation for the agency's actions. See Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto Ins. Co., 463 U.S. 29 (1983). It further contends that the regulations are "arbitrary and capricious in substance" and the rules embodied therein "represent an unreasonable policy choice in light of the delegating statute and its legislative history." See Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984). Respondent

contends that the regulations are entitled to deference under <u>Chevron</u> and are valid.

Summary judgment is an appropriate vehicle for determining the validity of regulations. See, e.g., <u>Altera Corp. & Subs. v. Commissioner</u>, 145 T.C. 91 (2015). To address petitioner's arguments, we must review in detail the history of the subject regulations.

### A. Relevant Legislative History and Administrative Record

#### 1. Revenue Act of 1962

Treasury promulgated the regulations at issue following the passage of the Revenue Act of 1962 (1962 Act), Pub. L. No. 87-834, sec. 12, 76 Stat. at 1006, which enacted sections 951 and 956 as part of subpart F of part III, subchapter N, chapter 1 of the 1954 Code (subpart F) as amended. Pursuant to section 951(a)(1)(B) U.S. shareholders were required to include in gross income their pro rata shares of a CFC's "increase in earnings invested in United States property", with that amount determined under the provisions of section 956. United States property was defined in section 956(b)(1) and included the same four categories of property (including obligations of United States persons) provided for currently under section 956(c)(1). Section 956(b)(2)(A)-(F) excepted certain items or transactions from the definition of United States property. Section 956(c),

concerning the treatment of CFC pledges and guaranties of obligations of United States persons, was identical to the provision currently enacted as section 956(d).

The Code sections making up subpart F (sections 951 through 964) were enacted in response to perceived abuses by U.S. taxpayers through the use of CFCs. See Dougherty v. Commissioner, 60 T.C. 917, 928 (1973) ("In subpart F, Congress has singled out a particular class of taxpayers, U.S. shareholders, whose degree of control over their foreign corporation allows them to treat the corporation's undistributed earnings as they see fit."). Generally Congress intended that sections 951(a)(1)(B) and 956 would operate "to prevent the repatriation of income to the United States in a manner which does not subject it to U.S. taxation." H.R. Rept. No. 87-1447, at 58 (1962), 1962-3 C.B. 405, 462. The report of the Senate Finance Committee accompanying the 1962 Act noted that "[g]enerally" untaxed CFC earnings invested in United States property are taxed to U.S. shareholders on the grounds that the use of such funds for domestic investment is a benefit, which "is substantially the equivalent of a dividend being paid to them." S. Rept. No. 87-1881, supra at 88, 1962-3 C.B. at 794. Congress provided specific exceptions under section 956(b)(2) because in its belief these items, although technically investments in domestic property, constituted "normal commercial transactions without the intention to permit the [CFC's] funds to

remain in the United States indefinitely". S. Rept. No. 87-1881, supra at 88, 1962-3 C.B. at 794.

## 2. Proposed and Final Regulations

On April 11, 1963, Treasury issued a Notice of Proposed Rulemaking, which set forth and solicited public comment on a package of regulations proposed under sections 955, 956, and 957(c). 28 Fed. Reg. 3515 (Apr. 11, 1963). Written comments received in connection with the proposed rulemaking included some relating to the proposed regulations under section 956. None of these comments raised concerns specifically as to the rules for pledges and guaranties in sections 1.956-2(c)(1) and 1.956-1(e)(2), Proposed Income Tax Regs., 28 Fed. Reg. 3549, 3550 (Apr. 11, 1963). The American Bar Association Section of Taxation submitted one comment that referenced "the general rule as to the treatment of pledges and guaranties", and which suggested that the proposed exception for guaranties made pursuant to "conduit arrangements" should be broadened. A public hearing was held on June 20, 1963.

On February 20, 1964, Treasury adopted as final the proposed regulations under section 956, subject to certain changes. T.D. 6704, 1964-1 C.B. (Part 1) 284. The preamble to the Treasury Decision stated the final regulations were promulgated "to conform * * * [the Income Tax Regulations] to section 956 of the

Internal Revenue Code of 1954, as added by section 12(a) of the Revenue Act of 1962" and stated they were adopted "[a]fter consideration of all such relevant matter as was presented by interested persons regarding the rules proposed". Id. The Treasury Decision stated that the regulations were issued under the authority contained in section 7805. Id., 1964-1 C.B. (Part 1) at 296. Sections 1.956-2(c)(1) and 1.956-1(e)(2), Income Tax Regs., were adopted substantially unchanged from the proposed regulations. The exception for CFC guaranties made pursuant to conduit financing arrangements was extensively revised and broadened. Compare sec. 1.956-2(c)(2), Proposed Income Tax Regs., 28 Fed. Reg. 3550 (Apr. 11, 1963), with T.D. 6704, 1964-1 C.B. (Part 1) at 293-294.

### 3. Statutory Amendments

The Omnibus Budget Reconciliation Act of 1993 (OBRA), Pub. L. No. 103-66, 107 Stat. 312, modified the "structure and operating rules" of section 956. H.R. Rept. No. 103-111, at 692 (1993), 1993-3 C.B. 167, 268. Sections 951(a)(1)(B) and 956(a) were amended to read in their current forms. See OBRA secs. 13232(a), (c), 107 Stat. at 501-502. OBRA did not amend substantively the Code sections defining United States property or requiring generally that pledgors or guarantors of obligations of United States persons be treated as holding such property. OBRA redesignated section 956(b) (defining United States property)

and (c) (relating to pledges and guaranties) as section 956(c) and (d), respectively, but otherwise it reenacted those two provisions fully. For the tax years in issue the rules under sections 1.956-2(c)(1) and 1.956-1(e)(2), Income Tax Regs., were the same as the final rules adopted in 1964.

### B. Analysis Under Principles of Administrative Law

#### 1. Legislative Rules and APA Section 553(b)

A distinction is drawn in administrative law between interpretive and substantive (or legislative) agency rules. An interpretive rule merely clarifies or explains preexisting substantive law or regulations. Elizabeth Blackwell Health Ctr. for Women v. Knoll, 61 F.3d 170, 181 (3d Cir. 1995). A legislative rule, by contrast, "creates rights, assigns duties, or imposes obligations, the basic tenor of which is not already outlined in the law itself". Dia Navigation Co. v. Pomeroy, 34 F.3d 1255, 1264 (3d Cir. 1994) (quoting La Casa Del Convaleciente v. Sullivan, 965 F.2d 1175, 1178 (1st Cir. 1992)). Legislative rules, unlike interpretive rules, have "the force and effect of law". Chrysler Corp. v. Brown, 441 U.S. 281, 303 (1979); see also Chao v. Rothermel, 327 F.3d 223, 227 (3d Cir. 2003).

The regulations at issue are legislative rules. The adjustments determined for SIHP's income can only be sustained on the basis that the regulations properly

apply to the CFCs' guaranties, and we would be unable to determine whether and in what amount the guaranties should cause an income inclusion for SIHP for the tax years in issue absent the rules expressed in the regulations. Thus they "impose[ ] obligations" not specifically outlined in the governing statute. In promulgating the regulations Treasury invoked section 7805, under which it is delegated authority to "prescribe all needful rules and regulations for the enforcement of" the Code. Such regulations carry the force of law, and the Code imposes penalties for failing to follow them. See Altera Corp. v. Commissioner, 145 T.C. at 116.

Legislative rules, because they "create new law, rights, or duties", are subject to the notice and comment requirements of the Administrative Procedure Act (APA), 5 U.S.C. sec. 553(b) (2012). SBC Inc. v. FCC, 414 F.3d 486, 497 (3d Cir. 2005). Pursuant to APA sec. 553(b) and (c) an agency promulgating regulations by informal rulemaking must (1) publish a notice of proposed rulemaking in the Federal Register, (2) provide "interested persons an opportunity to participate * * * through submission of written data, views, or arguments", and (3) "[a]fter consideration of the relevant matter presented, * * * incorporate in the rules adopted a concise general statement of their basis and purpose." These procedures are intended to assist judicial review and "to provide fair treatment for

persons affected by a rule." Home Box Office, Inc. v. FCC, 567 F.2d 9, 35 (D.C. Cir. 1977).

The administrative record reflects that Treasury's rulemaking for the legislative rules at issue complied with the requirements of APA sec. 553(b). Petitioner does not dispute that the agency properly promulgated the regulations by notice and comment. Nevertheless, we reach a determination as to this issue, and it is relevant insofar as petitioner contends that the agency's procedures in promulgating the regulations were inadequate. Petitioner contends that Treasury failed to satisfy "the reasoned decisionmaking requirement and the reasoned explanation requirement".

### 2. Procedural Requirements Beyond Notice and Comment

Congress may provide in the governing statute that rules thereunder are to be promulgated pursuant to more formal procedures than those required under APA sec. 553(b). See APA secs. 553(c), 556, 557; see also United States v. Allegheny-Ludlum Steel Corp., 406 U.S. 742, 756-757 (1972). However, absent a specific congressional directive the Supreme Court has held "that generally speaking * * * [APA sec. 553(b)] established the maximum procedural requirements which Congress was willing to have the courts impose upon agencies in conducting rulemaking procedures." Vt. Yankee Nuclear Power Corp. v.

Natural Res. Def. Council, Inc., 435 U.S. 519, 524 (1978); see also FCC v. Fox Television Stations, Inc., 556 U.S. 502, 513 (2009) (the APA "sets forth the full extent of judicial authority to review executive agency action for procedural correctness"). There may be circumstances that "justify a court in overturning agency action because of a failure to employ procedures beyond those required by * * * [APA sec. 553(b)]"; however, "such circumstances * * * are extremely rare." Vt. Yankee, 435 U.S. at 524.

APA sec. 706(2)(A) provides that a reviewing court shall in all cases hold unlawful and set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law". Pursuant to this standard an agency must "articulate a satisfactory explanation for its action." State Farm, 463 U.S. at 43. We must determine in the light of that explanation whether the agency's decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974) (quoting Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99 (1977)). The scope of our review "is a narrow one" and "the court is not empowered to substitute its judgment for that of the agency." Id. Although a court cannot provide a reasoned basis for the

agency's decision if the agency itself did not provide one, a court must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Id. at 286.

Petitioner relies on State Farm in arguing that an agency is bound in every case to meet "the reasoned decisionmaking and reasoned explanation requirements" and that Treasury's procedures failed to satisfy these requirements in respect of the final rules adopted for pledges and guaranties. In State Farm the Supreme Court held that an agency's decision to rescind a prior regulation was arbitrary and capricious under APA sec. 706(2)(A). In so holding the Supreme Court concluded that the agency's action was arbitrary and capricious because it "failed to present an adequate basis and explanation" for its decision. State Farm, 463 U.S. at 34. The Supreme Court wrote:

> Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. * * * [Id. at 43.]

Treasury's actions in promulgating the regulations at issue must be set aside if its procedures failed to satisfy the general standard under APA sec. 706(2)(A). However, the facts surrounding the agency action in State Farm are inapposite,

and the concerns that led the Court in that case to review more stringently the agency's process are not presented here.

The agency action in State Farm, 463 U.S. at 35, represented a clear and abrupt reversal in agency policy, and the earlier policy was supported by a substantial body of facts developed by the agency itself.  A number of facts continued strongly to support the initial rule over the rescission, and it was significant in the Court's view that Congress intended all agency findings under the governing statute to be "supported by 'substantial evidence on the record'". Id. at 43-44, 47-48.  The Court stated that "an agency changing its course must supply a reasoned analysis".  Id. at 57 (quoting Greater Boston Television Corp. v. FCC, 444 F.2d 841, 852 (D.C. Cir. 1970)).  Moreover, the Court found that the agency's decision to rescind the rule failed to consider an obvious modification that would have left the rule in place and continued to promote the statute's purpose.  See id. at 46-48.  Congress had expressly stated its intention that "safety shall be the overriding consideration in the issuance of standards" under the governing statute, and the Court suggested the agency may have given improper weight to other factors in its analysis.  Id. at 55.

Under the circumstances in State Farm, the Supreme Court concluded that the agency must provide a more extensive reasoned analysis and explanation in

order to demonstrate that its actions were not arbitrary, capricious, or otherwise not in accordance with the law.  In remanding the matter to the agency the Court stated that in the light of specific "limitations of the record" the agency's explanation was "not sufficient to enable us to conclude that the rescission was the product of reasoned decisionmaking".  Id. at 52.  The Court rejected the notion that in reviewing the agency's action under APA sec. 706(2)(A) it was "impos[ing] additional procedural requirements upon the agency."  State Farm, 463 U.S. at 50 (citing Vt. Yankee, 435 U.S. 519).

The regulations at issue did not reverse previously settled agency policy, and they were not promulgated contrary to facts or analysis that supported a different outcome.  Treasury's rulemaking in this case differs fundamentally from the agency action in State Farm because Treasury's decision did not (and could not) purport to rely on findings of fact.  Treasury's actions promulgating the rules for pledges and guaranties reflect at most the implementation of a policy judgment.  The administrative record reflects that no substantive alternatives to the final rules were presented for Treasury's consideration during the rulemaking process.  The agency did not act arbitrarily or capriciously by failing to address contrary viewpoints or findings of fact that were never developed or presented.

Petitioner contends that the regulations are not the product of reasoned decisionmaking because Treasury failed to consider during the rulemaking "important aspect[s] of the problem" associated with CFC pledges and guaranties. See id. at 43. Petitioner provides a list of factors that it contends are relevant as to "whether a given CFC guarantee can be considered a repatriation of earnings". Petitioner contends that the agency was obligated under the governing statute to weigh and balance these factors (and possibly others) to promulgate rules consistent with "the underlying purposes of section 956".

We do not agree that an on-the-record consideration of any particular factors is required for rulemaking under section 956(d). The plain text of the statute does not require the agency to engage in a process of balancing or to provide an analysis of its decisionmaking based on the factors that petitioner identifies. Congress stated clearly in the statute that any CFC guarantor of any obligation of a United States person "shall * * * be considered as holding" the underlying obligation. With respect to other issues concerning guaranties that are not addressed expressly in the statute (for example, the amount of United States property that the CFC should be treated as holding by reason of its guaranty), Congress used broad delegative terms in section 956(d). Generally we would not impose additional procedural requirements on any administrative proceeding

without a clear indication that Congress intended additional procedures to be observed.

Apart from the text of the statute, nothing in the statute's legislative history directs Treasury to promulgate rules in consideration of whether a particular guaranty causes an effective repatriation or in consideration of "economic realities" as petitioner sees them. The purpose underlying section 956 generally is "to prevent the repatriation of income", H.R. Rept. No. 87-1447, supra at 58, 1962-3 C.B. at 462, that is "substantially the equivalent of a dividend" to the U.S. shareholder, S. Rept. No. 87-1881, supra at 88, 1962-3 C.B. at 794. However, we find no support for the proposition that Congress intended rulemaking under section 956(d) to focus minutely on economic factors, which may or may not indicate in what amount a particular guaranty constitutes a repatriation of earnings. We do not conclude that Congress intended the amount deemed effectively repatriated to be an "important aspect of the problem" associated with guaranties that Treasury was bound to consider or give special weight to in promulgating rules under the statute. See State Farm, 463 U.S. at 43.

The preamble to the final rules stated that they were intended "to conform" the Income Tax Regulations to section 956, which they clearly and straightforwardly do. Put simply, the statute at issue and the rules adopted did not

require Treasury to engage in the level of detailed empirical analysis that the Court in State Farm found was integral to the rulemaking. Petitioner's focus on the "reasoned decisionmaking and reasoned explanation requirements" as it understands those requirements to be taken from State Farm is misplaced.

Treasury's rulemaking complied with the requirements of notice and comment under APA sec. 553(b). APA sec. 706(2)(A) imposes in addition a "general 'procedural' requirement of sorts by mandating that an agency take whatever steps it needs to provide an explanation that will enable the court to evaluate the agency's rationale at the time of decision." Pension Benefit Guar. Corp. v. LTV Corp., 496 U.S. 633, 654 (1990). We conclude that Treasury's procedures in this case satisfied this general requirement and were not arbitrary or capricious. The agency's path "may reasonably be discerned". Bowman Transp., 419 U.S. at 286.

Treasury's proposed and final rules concerning CFC pledges and guaranties sought to implement the clear wording of the statute and to equate the treatment of these transactions with the treatment of items of United States property under the statute. The generally applicable rule in section 1.956-2(c)(1), Income Tax Regs., that "any obligation" of a United States person with respect to which a CFC is a guarantor shall be treated as United States property held by the CFC, restates in

essence the text of the statute. The agency made no clear error in judgment by adopting the rule that it did, rather than undertaking to consider a more nuanced rule of the sort petitioner advocates to govern a deemed effective repatriation. As we have said, the statute makes no mention of an effective repatriation standard, and we can find no grounds for imposing such a standard.

The rule for the amount of United States property considered held by reason of a pledge or guaranty likewise adheres to the text of the statute. Under section 1.956-1(e)(2), Income Tax Regs., the amount treated as held by the CFC for its guaranty will in most cases equal the amount the CFC would have been treated as holding had it held the underlying obligation (i.e., the principal amount of the obligation). The general rule under section 956(a) is that the amount of any United States property taken into account is its adjusted basis, and ordinarily a lender takes a basis in a loan equal to the unpaid principal amount.

Treasury's decisionmaking was uncomplicated, but that does not mean the administrative process was arbitrary or otherwise deficient under the standard articulated in APA sec. 706(2)(A). No comments, significant or otherwise, were raised by interested parties during the rulemaking. As a reviewing court, we cannot demand that an agency engage in and document an exhaustive review of hypothetical "aspect[s] of the problem" that no one has raised and which Congress

has not asked the agency to consider. So long as an agency's rationale can reasonably be discerned and that rationale coincides with the agency's authority and obligations under the relevant statute, a reviewing court may not "broadly require an agency to consider all policy alternatives in reaching decision." State Farm, 463 U.S. at 51.

Petitioner cites certain agency documents, a 2002 field service advice memorandum (FSA) and a 2015 notice of proposed rulemaking (2015 NPRM), to argue that respondent and Treasury "have themselves recognized that the regulations at issue are inadequate". These documents acknowledge that the regulations prescribe no treatment for situations in which multiple CFCs guarantee the same obligation. The FSA noted that where multiple CFCs of the same U.S. shareholder have guaranteed the same obligations, computing the income inclusion under the current rules may produce "strange results". Field Service Advice 200216022 (Jan. 8, 2002). Similarly, the preamble to the 2015 NPRM explains that "[t]o the extent that the CFCs have sufficient earnings and profits, there could be multiple section 951 inclusions with respect to the same obligation that exceed, in the aggregate, the unpaid principal amount of the obligation." 80 Fed. Reg. 53062 (Sept. 2, 2015). The preamble also stated that Treasury and respondent were considering prescribing new regulations "to allocate the amount

of the obligation among the relevant CFCs so as to eliminate the potential for multiple inclusions and, instead, limit the aggregate inclusions to the unpaid principal amount of the obligation." Id. Petitioner contends that these statements constitute "a functional admission" that whether and how regulations under section 956(d) should apply to situations involving multiple guarantors "are questions that were never considered by the existing regulatory scheme." In 2016 Treasury issued final regulations without proposing or adopting any additional provisions to limit the income inclusion in cases of multiple guarantors. T.D. 9792, 2016-48 I.R.B. 751; see Crestek, Inc. v. Commissioner, 149 T.C. __, __ n.8 (slip op. at 29-30) (July 27, 2017) (discussing 2015 NPRM and 2016 final regulations).

The documents that petitioner cites are nonprecedential, and we would not rely on them for a point of law even if we found their reasoning applicable and persuasive. See sec. 6110(k)(3) (a written determination may not be used or cited as precedent); Gen. Dynamics Corp. v. Commissioner, 108 T.C. 107, 120 (1997) (proposed regulations accorded no more weight than a litigating position). In any event, the specific situation addressed in both documents is distinguishable from petitioner's case. The income inclusions that respondent determined for SIHP do not exceed the unpaid principal amount of the guaranteed obligations. We also

cannot agree that an agency's recognition that regulations make no provision for or may produce strange results under particular circumstances is an admission of their "inadequacy" as a matter of administrative law. Treasury is authorized to reconsider and revise regulations under the Code (provided that adequate procedures are employed), and the agency's decision to revisit the rules for pledges and guaranties should not be taken as evidence that the current rules are in some way procedurally defective.

On the basis of the administrative record we conclude that Treasury's decisionmaking was based on a consideration of relevant factors under the statute and there was no clear error in judgment. The agency's procedures in promulgating the regulations at issue were sufficient. We would not invalidate them on that basis.

### 3. The Agency's Construction of the Statute

The regulations reflect Treasury's determination that section 956(d) supports and Congress intended a broad rule which treats any CFC guarantor of any (nonexcepted) obligation of a United States person as holding United States property equal to the principal value of the obligation guaranteed. Ordinarily a court reviews an agency's substantive construction of a statute the agency is charged with administering under the two-step test provided in Chevron. The

deferential standard under Chevron is appropriate "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." Mayo Found. for Med. Educ. & Research v. United States, 562 U.S. 44, 57 (2011) (quoting United States v. Mead Corp., 533 U.S. 218, 226-227 (2001)). The applicability of Chevron deference "does not turn on whether Congress's delegation of authority was general or specific." Id. "[T]he ultimate question is whether Congress would have intended, and expected, courts to treat [the regulation] as within, or outside, its delegation to the agency of 'gap-filling' authority." Id. at 58 (quoting Long Island Care at Home, Ltd. v. Coke, 551 U.S. 158, 173-174 (2007)).

Congress intended to delegate to Treasury the authority to promulgate rules under section 956(d) having the force and effect of law, and its rulemaking was an exercise "within the statutory grant of authority". Id. (quoting Long Island Care, 551 U.S. at 173). Treasury promulgated the regulations pursuant to an express directive in the governing statute and pursuant to the general rulemaking authority established in section 7805. As the agency was bound to do for legislative rules, it followed procedures prescribed under APA sec. 553(b). "It is fair to assume * * * Congress contemplates administrative action with the effect of law when it

provides for a relatively formal administrative procedure tending to foster * * * fairness and deliberation", Mead, 533 U.S. at 230, and the use of notice and comment by the agency is "a 'significant' sign that a rule merits Chevron deference", Mayo Found., 562 U.S. at 57-58 (quoting Mead, 533 U.S. at 230-231). The regulations are properly analyzed under Chevron.

Under step one of Chevron, 467 U.S. at 842, we ask "whether Congress has directly spoken to the precise question at issue." "If the intent of Congress is clear, that is the end of the matter". Id. Here, neither party contends that Congress has spoken directly as to the relevant issues, i.e., when and in what amount a CFC will be considered to hold United States property under section 956 as a result of its guaranty of an obligation of a United States person. The statute provides only that a pledge or guaranty shall be treated as holding the underlying obligation "under regulations prescribed by the Secretary". Sec. 956(d). None of the ordinary tools of statutory construction leads us to conclude that Congress has clearly expressed its intent as to what form those regulations should take or the substance that should be reflected in them. See City of Arlington v. FCC, 569 U.S. 290, 296 (2013).

Where, as here, the statute does not address the question at issue, step two of Chevron, 467 U.S. at 843, asks only whether the agency's position "is based on

a permissible construction of the statute".  In respect of a legislative regulation we will defer to the agency's construction of the statute "unless it is 'arbitrary and capricious in substance, or manifestly contrary to the statute'."  Mayo Found., 562 U.S. at 53.  If the agency's choice "represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned."  Chevron, 467 U.S. at 845 (quoting United States v. Shimer, 367 U.S. 374, 383 (1961)).

Petitioner contends that the regulations under section 956(d) cannot pass the deferential test under Chevron step two because the rules embodied therein are an unreasonable policy choice in the light of the statute and its legislative history. Petitioner contends that Congress "was only concerned in section 956 with investments in U.S. property that repatriate earnings" and that a CFC's guaranty of an obligation of a United States person is not "necessarily a transaction that repatriates earnings".  Petitioner argues that "whether and the degree to which any given guarantee * * * can be considered to have repatriated earnings are necessarily fact-specific questions, which will depend on the 'facts and circumstances' of the transaction".

Treasury's regulations do not inquire whether a particular guaranty has "effectively repatriated" earnings of the CFC to its U.S. shareholders. The generally applicable rules treat <u>any</u> CFC guarantor as holding United States property equal to the <u>full unpaid principal amount</u> of the obligation. Petitioner argues that the regulations are "too blunt" and "too mechanical" and fail to reasonably implement the "nuanced approach" for pledges and guaranties that it contends Congress intended.

The general rules for the treatment of pledges and guaranties are not at odds with the wording of the statute. Nothing in the plain text of section 956(d) indicates that any particular pledge or guaranty shall not be treated as holding the underlying obligation or directs that the amount considered to be held should be only the amount that can be deemed to be repatriated. That Congress provided guaranties should be treated "under regulations prescribed by the Secretary" does not establish, as petitioner contends, that Treasury was bound to devise a more nuanced or facts-and-circumstances approach for such transactions. Special operating rules for the treatment of pledges and guaranties as United States property would be required in any event, because the general rule in the statute for the amount of United States property considered held by the CFC could not apply

with respect to a pledge or guaranty. See sec. 956(a) (flush language) (e.g., a guarantor ordinarily takes no basis in the guaranty).

We also cannot conclude as petitioner contends that the rules promulgated by the agency are contrary to Congress' intent. Congress generally intended that section 956 should cause income inclusions where CFC funds are directed to invest in United States property for the benefit of its U.S. shareholders, such that those funds are effectively repatriated for use by the shareholders. A CFC's guaranty of a U.S. shareholder's (or related party's) debt clearly benefits the U.S. shareholder, and nothing in the statute or its legislative history suggests that Congress expected Treasury to craft ad hoc exceptions based on some sort of facts-and-circumstances test. From the legislative history of section 956 it appears Congress itself thought extensively about which transactions should be treated the same as repatriations of CFCs' earnings.

Congress has provided for numerous exceptions to the definition of United States property, and it has added and removed exceptions over time to reflect its evolving conception of what should or should not require an income inclusion as an investment of earnings in United States property. See Tax Reform Act of 1976, Pub. L. No. 94-455, sec. 1021(a), 90 Stat. at 1618-1619; Deficit Reduction Act of 1984, Pub. L. No. 98-369, sec. 801(d)(8), 98 Stat. at 996-997; Taxpayer Relief Act

of 1997, Pub. L. No. 105-34, sec. 1173(a), 111 Stat. at 988-989; American Jobs Creation Act of 2004, Pub. L. No. 108-357, sec. 407(a), 118 Stat. at 1498-1499. Some of these exceptions effect the application of section 956(d); for example, by providing that certain obligations are not to be included within the definition of United States property. See sec. 956(c)(2)(C), (F), (J), (L); see also 80 Fed. Reg. 53061 (Sept. 2, 2015) ("[T]he general exceptions to the definition of United States property would apply to the obligation treated as held by the CFC [by reason of its guaranty]."). However, Congress has never undertaken to amend or provide exceptions to section 956(d) directly. Congress' decision to leave the terms of section 956(d) unchanged may reflect its understanding that a CFC ordinarily would not be directed by its shareholders to provide a guaranty unless the guaranty was necessary and of value to the borrower and the shareholders.

Petitioner argues extensively that the regulations cause income inclusions for U.S. shareholders contrary to "commercial and economic reality". Petitioner in particular criticizes the regulations for failing to address circumstances in which a CFC is one of several guarantors of a single obligation. Petitioner contends that if multiple guaranties support the underlying obligation then no one could reasonably conclude that "the entire unpaid principal was obtained [solely] as a result of the CFC['s] guarantee". Petitioner also points out that in situations where

(as here) <u>multiple CFCs</u> have guaranteed the same obligation the regulations will treat each CFC as holding United States property equal to the full unpaid principal amount of the obligation. The regulations therefore could allow under certain circumstances (which are <u>not</u> present here) multiple, arguably duplicative income inclusions that exceed in the aggregate the principal value of the obligation.

Even accepting petitioner's arguments concerning economic reality and the "strange results" that the regulations may yield under particular circumstances, it must be said that an agency is not required to take account of and make special accommodation for every scenario in which its rules may apply. "Regulation, like legislation, often requires drawing lines." <u>Mayo Found.</u>, 562 U.S. at 59. Undoubtedly, as petitioner has shown, alternatives exist to (and improvements might be imagined for) the generally applicable rules for CFC pledges and guaranties. Nevertheless, "we do not sit as a committee of revision to perfect the administration of the tax laws", <u>United States v. Correll</u>, 389 U.S. 299, 306-307 (1967), and we will uphold regulations that have a reasonable basis in the statutory history even where the taxpayer's challenge to a regulation's policy has "logical force", <u>Fulman v. United States</u>, 434 U.S. 528, 536 (1978). "The role of the judiciary in cases of this sort begins and ends with assuring that the

Commissioner's regulations fall within his authority to implement the congressional mandate in some reasonable manner." Correll, 389 U.S. at 307.

The regulations implemented a reasonable interpretation of section 956(d), i.e., that in the ordinary case a pledgor or guarantor should be treated as holding the underlying obligation. Exceptions are provided for direct and indirect transactions in the statute and in the regulations, and taken as a whole Treasury's rules are a reasoned approach to determining when and in what amount a guaranty should be treated as an investment in United States property under section 956. It is not manifestly contrary to the statute or unreasonable that the agency would choose a broad baseline rule for pledges and guaranties as opposed to a less administrable case-by-case approach. Certainly nothing in section 956(d) indicates that any particular type of pledge or guaranty should not be treated as holding the obligation or directs that the amount considered to be held should be only the amount that can be deemed to be repatriated. On the basis of our own exhaustive review we conclude that at no point in the extensive legislative history of section 956 has Congress expressed a desire that inclusions for guaranties be determined case by case.

We uphold the validity of sections 1.956-2(c)(1) and 1.956-1(e)(2), Income Tax Regs. Treasury promulgated these regulations by procedures that satisfy the

requirements of the APA, and the substance of the regulations is based on a permissible construction of section 956(d) entitled to deference under Chevron.

While "neither antiquity nor contemporaneity with [a] statute is a condition of [a regulation's] validity", it is relevant to petitioner's case that the contested regulations had existed for nearly 50 years at the time the CFCs executed the guaranty transaction at issue. See Smiley v. Citibank (S.D.), N. A., 517 U.S. 735, 740 (1996). Congress reenacted section 956(d) unamended in OBRA, at which time Congress had revisited in depth the operating rules under section 956. Congress expressed no concerns as to the current rules governing pledges and guaranties, which strongly suggests that it did not view Treasury's construction of section 956(d) as unreasonable or contrary to the law's purpose. See Cottage Sav. Ass'n v. Commissioner, 499 U.S. 554, 561 (1991).

III.    Petitioner's Other Contentions

Petitioner contends that in the event we conclude, as we have, that the regulations are valid, we should not grant respondent's motion for summary judgment. It contends that respondent's proposed application of the regulations, determining income inclusions of the full amount of the CFCs' applicable earnings, is inconsistent with the purpose of section 956. It contends that an examination of facts and circumstances beyond those identified by respondent as

dispositive is necessary to determine whether "in substance" the CFCs' guaranties repatriated earnings in the amounts of the asserted inclusions.

Petitioner avers and submits affidavits of its officers in support of the following facts: (1) SIG and its domestic affiliates maintained assets in accounts at Merrill Lynch of approximately twice the value of the SIG notes; (2) Merrill Lynch never indicated during negotiations that SIG required "additional credit support" from entities that held assets outside of Merrill Lynch; (3) the CFCs had combined net assets of $240 million at the time the SIG notes were executed, which was not enough to satisfy repayment of the SIG notes; and (4) Merrill Lynch requested that the CFCs sign the ARGSA only because it wanted to "ring fence" the SIG affiliates from which it could seek repayment in the event of a default and to prevent "leakage" of assets held in Merrill Lynch accounts. Petitioner contends that these facts show the CFCs' guaranties had no substantial effect on SIG's ability "as a credit matter" to receive the funds represented by the SIG notes. Petitioner contends that the CFCs' earnings had nothing to do with Merrill Lynch's decision to lend to SIG.

Neither section 956(d) nor the regulations inquire into the relative importance that a creditor attaches to a guaranty. Crestek, Inc. v. Commissioner, 149 T.C. at __ (slip op. at 25-26). A guarantor's precise financial condition or the

likelihood that it would be able to make good on its guaranty are irrelevant in determining under the regulations whether the guaranty gives rise to an investment in United States property. Id. at __ (slip op. at 28). The regulations applicable in this case provide categorically that any obligation of a United States person with respect to which the CFC is a guarantor shall be considered United States property held by the CFC in the amount equal to the unpaid principal. They make no provision for reducing the section 956 inclusion by reference to the guarantor's financial strength or its relative creditworthiness. Id. at __ & n.8 (slip op. at 29-30).

In effect, petitioner asks us to insert into the regulations an added requirement that the facts and circumstances should demonstrate "an actual repatriation has occurred" in respect of the amounts guaranteed. Petitioner contends that a facts-and-circumstances analysis is warranted because the regulations as promulgated do not provide any special treatment for guaranties of obligations for which there are multiple guarantors. Petitioner contends that we are required under these circumstances "to apportion the amount of U.S. property * * * held by each CFC guarantor among themselves and the remaining guarantors, the pledgors, and the obligor."

The rules do not allow apportioning a guaranteed obligation among guarantors or the obligor, and the statute does not require that the rules implement an approach focusing strictly on the amount of an obligation that a particular guarantor effectively repatriates. The CFCs both gave their guaranties of obligations of a United States person, and the regulations accordingly treat each as holding United States property equal to the unpaid principal of those obligations. We cannot ignore or alter regulations that are an authoritative and reasonable interpretation of the governing statute. The amounts determined under section 956 are capped by the statute at the CFCs' applicable earnings for the tax years in issue. Those amounts are not in dispute and do not exceed the value of the underlying obligations.

Lastly, petitioner contends that the structure of the ARGSA "and related agreements" should affect our application of the rules to the guaranties in this case. Petitioner argues that "the most a given CFC could be deemed to have 'invested' in U.S. property is that amount * * * for which it agreed to be ultimately responsible", and pursuant to their rights of contribution under the pro rata provision petitioner avers that the CFCs "would have been entitled to approximately 100% reimbursement for any amounts paid" as a result of the

guaranties.  Petitioner fails to explain how the related agreements should affect our analysis.

We cannot view the pro rata provision as offsetting the CFCs' guaranties. The CFCs undertook unlimited guaranties for full payment of the SIG notes, and first and foremost the CFCs would have been legally obligated to make any such payments out of their own earnings and profits.  Their rights to contribution from other guarantors were subsidiary to their obligations under the guaranties.  It is questionable whether, in the event that they had been required to make payments pursuant to their guaranties, the CFCs would have been seriously inclined to enforce the pro rata provision against their commonly owned affiliates.

Petitioner vigorously contends that many pledges and guaranties, and particularly the guaranties at issue, are not necessary for the receipt of the loan by the borrower, and for that reason a CFC guarantor should not be automatically treated as repatriating earnings for use by its U.S. shareholders.  Petitioner's argument, however, highlights the solution to the predicament in which it now finds itself:  If a guaranty by a CFC is unnecessary, then it need not be made; and the application and effects of the regulations under section 956(d) will be avoided.

This Court has issued previously two opinions concerning income inclusions determined under the provisions of section 956(d) and the subject

regulations, <u>Ludwig v. Commissioner</u>, 68 T.C. 979 (1977), and <u>Crestek, Inc. v. Commissioner</u>, 149 T.C. __ (July 27, 2017). In neither case did the taxpayer challenge the validity of the regulations. The dearth of caselaw on this topic is unsurprising, because, as petitioner acknowledges, the rules promulgated for pledges and guaranties lend themselves to easy tax planning. Petitioner may not undo the effects of its transaction because in this particular instance the generally applicable rules generate an outcome that is unfavorable to it.

The regulations apply and support the income inclusions that respondent determined for SIHP under sections 951(a)(1)(B) and 956. We sustain respondent's determinations in the FPAAs that SIHP has income inclusions for the tax years in issue equal to the CFCs' applicable earnings.

IV.    Applicable Tax Rate

The remaining issue for our consideration involves the tax rate applicable to SIHP's income inclusions. Petitioner contends that any amount included in SIHP's gross income attributable to SIHL/SEHL's guaranty should be "qualified dividend income" under section 1(h)(11). Respondent determined in the FPAAs that the income inclusions were not qualified dividend income and are properly taxed as ordinary income.

As enacted in the Jobs and Growth Tax Relief Reconciliation Act of 2003, Pub. L. No. 108-27, sec. 302, 117 Stat. at 760, section 1(h)(11) provides preferential tax rates for qualified dividend income. Qualified dividend income includes dividends received during the taxable year from "qualified foreign corporations". Sec. 1(h)(11)(B)(i)(II). A qualified foreign corporation is generally either a corporation incorporated in a possession of the United States or a corporation eligible for the benefits of a comprehensive income tax treaty with the United States. Sec. 1(h)(11)(C)(i).

STS was organized under the laws of the Cayman Islands, which has no comprehensive income tax treaty with the United States. Respondent asserts that STS was not a qualified foreign corporation during the tax years in issue, and petitioner does not contend otherwise. Accordingly, we will consider only whether any income inclusion attributable to SIHL/SEHL's guaranty may be taxed at the preferential rates under section 1(h)(11).

This Court has held previously that income inclusions required under sections 951(a)(1)(B) and 956 do not constitute qualified dividend income under section 1(h)(11). Rodriguez v. Commissioner, 137 T.C. 174 (2011), aff'd, 722 F.3d 306 (5th Cir. 2013). In Rodriguez v. Commissioner, 137 T.C. at 177, the CFC owned real and tangible personal property located in the United States, and

we held that an income inclusion under section 951 was not a "dividend" to the CFC's U.S. shareholders, as that term is defined in section 316(a). We reasoned that the section 951 inclusion involves no change in ownership of corporate property and the inclusion arises not from any distribution of property by the CFC but rather from its investment of earnings in specified property. Id.

Petitioner contends that our result in Rodriguez should not control here. Petitioner contends that the holding in Rodriguez applied specifically to CFC investments in real or tangible United States property, which did not result in any distribution because the CFC continued to hold the property and the shareholders received no property. Petitioner argues that in this case the justification for the income inclusions was a "deemed investment" in property, which "necessarily involve[d] a constructive or deemed distribution" in the form of the cash that SIG received from Merrill Lynch. Petitioner contends that we should distinguish Rodriguez as being decided narrowly on its facts and conclude in this case that deemed or constructive dividends were paid out of the CFCs' earnings and profits, to which section 1(h)(11) may apply.

We find no merit in the distinctions that petitioner attempts to draw from Rodriguez. There is no reason to differentiate between an investment in tangible United States property under section 956(c)(1)(A) and what petitioner terms a

"deemed investment" by reason of a guaranty under section 956(d). In either case the U.S. shareholder obtains the use and benefit of domestic property through the use of CFC earnings. When a CFC guarantees a loan, the shareholder or a related party benefits from the use of loan proceeds; but the CFC has not distributed its earnings any more than if it had used the earnings to purchase tangible property. In this case, as in <u>Rodriguez</u>, no distribution of property occurred from the CFCs to their U.S. shareholder. Simply put, no transfer of ownership from corporation to shareholder occurred with respect to any property.

If we decline to interpret <u>Rodriguez</u> as being decided narrowly on its facts, then petitioner contends in the alternative that <u>Rodriguez</u> was decided incorrectly. Petitioner contends that in <u>Rodriguez</u> we disregarded our own precedent that the taxation of undistributed CFC earnings is justified because investments in United States property may be treated the same as deemed or constructive dividends. Petitioner cites <u>Dougherty v. Commissioner</u>, 60 T.C. 917, a case in which we upheld the constitutionality of section 951(a)(1)(B) and in which we wrote that section 951(a)(1)(B) "has the stated objective of treating a controlled foreign corporation's increase in earnings invested in U.S. property as if it were a dividend paid to the corporation's shareholders." <u>Id.</u> at 926.

The fact that section 951 in operation treats a CFC's investment in United States property "as if it were a dividend" in no way establishes that the income inclusions required for shareholders thereunder actually are dividends for general purposes of the Code. See Rodriguez v. Commissioner, 137 T.C. at 179-180; see also Klein v. Commissioner, 149 T.C. __, __ (slip. op. at 17-23) (October 3, 2017); Muncy v. Commissioner, T.C. Memo. 2017-83 (concluding that "the distinction between 'as if' and 'as' is significant"). In Rodriguez v. Commissioner, 137 T.C. at 178, we found ample reason to conclude that, absent express provision, Congress did not intend such inclusions to be considered dividends. We cited Code sections that provide under limited circumstances and for limited purposes that section 951 inclusions should be treated the same as dividends. We concluded that such careful legislative design would be rendered superfluous and unnecessary if (contrary to well-established tenets of statutory construction) we determined that section 951(a)(1)(B) gives rise to a dividend in the ordinary course. Id.; see also Rodriguez v. Commissioner, 722 F.3d at 311 ("[I]f all section 951 inclusions constituted qualified dividends, then statutory provisions specifically designating certain inclusions as dividends would amount to surplusage."). We also concluded that the structure of section 956, particularly as it has evolved over time, strongly indicates that inclusions for investments in

United States property do not constitute dividends under the Code. Rodriguez v. Commissioner, 137 T.C. at 180; see also Rodriguez v. Commissioner, 722 F.3d at 311 ("[T]he original version of section 956 specifically stated that Congress did not intend amounts calculated thereunder to constitute dividends. * * * It does not appear that the omission of this language from the new version of the statute was intended to change the treatment of amounts calculated under section 956.").

We conclude that the rationale in Rodriguez applies with equal force to the income inclusions at issue, which were determined under sections 951(a)(1)(B) and 956(d). The income inclusions for the CFCs' guaranties were not dividends received by SIHP, and accordingly they are not qualified dividend income under section 1(h)(11). Absent a showing that some other characterization should apply under the Code, any income included in SIHP's gross income for the tax years in issue should be treated as ordinary income.

We have considered all arguments made, and, to the extent not mentioned, we conclude that they are moot, irrelevant, or without merit.  To reflect the foregoing,

<u>An order and decision will be entered granting respondent's motion for summary judgment and denying petitioner's motion for summary judgment</u>.